UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO. 7:21-cv-89

| | |
|---|---|
| DUSTIN MATTHEWS, <br><br> Plaintiff, <br><br> v. <br><br> HERC RENTALS INC., <br><br> Defendant. | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Dustin Matthews ("Plaintiff") brings this action against Defendant Herc Rentals Inc. ("Defendant") for violations of the Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-240 *et seq.* ("REDA"), and wrongful discharge in violation of public policy ("WDPP").

## NATURE OF THE ACTION

1. Plaintiff alleges that Defendant violated the Retaliatory Employment Discrimination Act ("REDA") by subjecting him to retaliation for reporting workplace safety violations and wage payment violations, in the form yelling, swearing, and berating Plaintiff, reprimanding Plaintiff for taking complaints to upper level managers; giving Plaintiff a negative performance review, and terminating Plaintiff's employment.

2. Plaintiff alleges a claim for wrongful discharge in violation of public policy ("WDPP") because Defendant terminated Plaintiff for engaging in protected activity and such termination is against the public policy of North Carolina, as set forth in the General Statutes.

## PARTIES, JURISDICTION, AND VENUE

3. Plaintiff is, and was at all relevant times, a resident of Supply, North Carolina.

4. Defendant is a Delaware corporation with an identified principal place of business of 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134.

5. Defendant's registered office in North Carolina is located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615.

6. Plaintiff was an employee of Defendant and worked at Defendant's 5935 Market Street, Wilmington, North Carolina 28405 location.

7. This Court has jurisdiction under 28 U.S.C. § 1332 because Defendant is a Delaware corporate with a principal place of business in Florida, Plaintiff is a citizen of North Carolina, and the amount in controversy exceeds $75,000.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, Defendant operates its business in this judicial district, and Defendant is registered to transact business in the State of North Carolina.

9. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

## ADMINISTRATIVE EXHAUSTION

10. Plaintiff satisfied his obligation to exhaust his administrative remedy by timely filing a retaliatory discrimination complaint with the North Carolina Department of Labor ("NCDOL") on or around September 25, 2020.

11. On April 21, 2021, the NCDOL issued a right-to-sue letter and Plaintiff timely brings this action within ninety (90) days of her receipt thereof.

12. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## STATEMENT OF FACTS

13. Plaintiff was hired by Defendant on or around February 19, 2016 as a tractor trailer driver.

14. Defendant is a full-service equipment rental company.

15. During his employment, Plaintiff was primarily responsible for hauling rental equipment to various customer sites.

16. During his employment, Plaintiff's immediate supervisor was Richie Markuson ("Markuson"), the branch manager, and the regional manager was Jason Glover ("Glover").

17. During Plaintiff's approximately four years of employment, he made multiple workplace safety complaints, including but not limited to the complaints discussed herein.

18. Beginning as early as May 2016, Plaintiff was told by shop manager Jimmy Wilson to operate a truck with illegal tire tread.

    a. Plaintiff reported the problem to Markuson, who told him to operate the truck regardless of the safety problem.

    b. When Plaintiff told Markuson that it would be illegal to operate the truck in its current condition, Markuson told him that if Plaintiff refused to drive it, he would need to find another job.

    c. Plaintiff then called Defendant's human resources 1-800 number and spoke with a safety official. The safety official agreed with Plaintiff's decision not to drive the truck with illegal tread.

    d. Upon information and belief, the safety official then called Markuson. After the call, Markuson yelled at and berated Plaintiff for going above his head.

    e. Markuson then sent Plaintiff home for the day.

  f.  The following day, Markuson instructed Plaintiff to work for a couple of hours. When Plaintiff reminded him that he was guaranteed 40 hours of work each week, Markuson replied, "only when everything is right."

19. In or around June 2017, Plaintiff asked a coworker not to smoke in the company vehicle, which was not only unsafe but also against company policy.

  a.  Plaintiff reported the violation to Markuson. When the coworker continued to smoke in the company vehicle, Plaintiff then reported the violation to Glover, who confirmed the company policy and addressed it. Markuson then berated and cussed at Plaintiff for going over his head.

  b.  Glover then informed all employees that smoking in company vehicles was against company policy. In retaliation for going over his head, Markuson told the employees that it was Plaintiff who "blew the whistle" (e.g., reported the smoking violation). When Plaintiff asked Markuson why he disclosed who the whistleblower was, Markuson replied, "because you keep getting me in trouble."

20. In or around May 2018, Plaintiff discovered a piece of broken equipment that he was supposed to transfer from one customer location to another. Because broken equipment could cause harm to a customer, Plaintiff took photos of the problem and sent them to Markuson.

  a.  Markuson instructed me to call Rob Istone ("Istone"), a salesman, who then told me not to tell the customer and to leave it at the job site.

  b.  Plaintiff disagreed with this instruction from Istone, so he sent the photos to Glover. Glover then instructed Markuson to repair the equipment before it was rented again.

c. The next day, Markuson berated and cussed at Plaintiff for sending the photos to Glover and stated, "what is it going to take to get you to stop trying to get me fired?"

21. In or around June 2018, I was instructed to take a piece of equipment called a reach lift to a customer, despite Wilson knowing that the equipment was broken. (The broken reach lift had been on Defendant's "dead line"). The customer saw that the equipment was broken and declined to use it. When Plaintiff brought the equipment back to Defendant's yard, he was ridiculed "for always causing problems."

22. In or around August 2018, Plaintiff informed Wilson on several occasions that the hydraulic line on a truck was rubbing against the truck's frame and catwalk. Upon information and belief, this is a department of transportation ("DOT") violation and a ticketable offense for commercial drivers.

a. Plaintiff recorded and reported this violation on his daily vehicle inspection reports.

b. When Defendant's corporate office called to inquire about what was being done to remedy the broken hydraulic line, Markuson cussed at and berated Plaintiff for always complaining about the truck being broken in front of other employees.

c. Markuson's behavior was significantly distressing to Plaintiff, and caused him to tear up.

d. Markuson then sent Plaintiff home and said they would call him when the truck was repaired.

e. Upon information and belief, the hydraulic line was never fixed.

f. Plaintiff reported Markuson's conduct to Glover.

23. In or around September 2018, Plaintiff was dispatched to make a delivery using a rollback tow truck that had a flat tire. Plaintiff took the rollback to have the tire fixed or replaced and was instructed to use a second rollback. However, the second rollback was also not driveable due to problems with the tire tread. Plaintiff was instructed by Markuson to fill the tire with air and make the delivery.

    a. Wilson called Plaintiff a "whiner" and cussed at him for complaining about the condition of the first rollback truck.

    b. Upon returning from his delivery with the second rollback tow truck, the tire was flat. Defendant's Myrtle Beach employees then used the rollback for approximately three weeks and returned the truck with the same flat tire.

    c. Plaintiff was then instructed to take the second rollback on a delivery to Fayetteville, despite the flat tire.

    d. When Plaintiff refused, Markuson cussed at him and sent him home.

    e. Plaintiff reported the harassment he was receiving from Markuson and other employees to human resources, but was told that it was not human resources' problem. Plaintiff was instructed to call Glover, which he did.

    f. When Markuson learned that Plaintiff contacted Glover, Markuson yelled at him for "going over his head."

24. In or around October 2018, Plaintiff reported to Markuson that another employee had not completed his job. The other employee called Plaintiff a "motherfucking snitch," threatened to kill Plaintiff, told him "I fucked your mom and now I'm going to fuck you and kill you," and also followed Plaintiff around the work yard making throat cutting gestures.

a. When Plaintiff reported the other employee's conduct to Markuson, Markuson and Glover suspended me and the other employee, pending investigation.

b. The other employee made social media posts about being under the influence of drugs while operating equipment at work. I forwarded this information to human resources.

c. Defendant then terminated the other employee and I was permitted to return to work after being suspended for three days.

25. During Plaintiff's annual performance review in or around April 2019, Markuson told him that he was receiving a score of 2.8 because Plaintiff allegedly told a customer the reach lift had been on the dead line (June 2018 incident); and because Plaintiff allegedly always went over Markuson's head with problems.

a. Upon information and belief, Plaintiff received the lowest score of his performance review compared to his colleagues at that yard.

b. Plaintiff disputed his review score with Markuson, and advocated for himself because he was the only employee who showed up for work for four days after Hurricane Florence. Plaintiff also reminded Markuson that he worked longer hours than the other drivers.

c. Markuson's response was, "let's work on coming to me first and stop calling corporate on me and we will see for the next year."

d. Plaintiff's annual raise was based on his performance review, and he received the lowest raise of all the drivers on the yard that year.

e. Upon information and belief, there was no objective basis, unrelated to Plaintiff's workplace safety complaints, upon which Defendant could base the negative performance review.

26. In or around March 2020, Plaintiff was dispatched to pick up a piece of equipment called a 750 cfm towable tailor ("750 cfm") that a customer was having problems with.

a. Plaintiff drove a company Ford F-250 truck that had DOT tags to retrieve the 750 cfm.

b. When Plaintiff arrived, he noticed the hitch on the 750 cfm was badly bent, the safety chain was a foot too short, and the power cable for the lights did not fit any of the company vehicles.

c. Plaintiff took photographs of the problems with the 750 cfm and sent them to Markuson. Markuson instructed Plaintiff to use a rollback tow truck and winch to retrieve the 750 cfm instead.

d. When Plaintiff returned to the yard, he wrote up the safety issues in a report and provided the report to Markuson and Jeremy.

e. Upon information and belief, the following day, Markuson told Jeremy that it was okay to take the company Ford F-250 truck to bring the 750 cfm back to the customer.

f. Upon information and belief, Jeremy did not have a medical examiner's certificate (commonly referred to as a "medical card") allowing him to drive a commercial DOT vehicle, like the F-250, and Markuson expressly told him it was okay to drive without one.

g. When Plaintiff confronted Markuson about allowing Jeremy to drive the 750 cfm back to the customer using the F-250, Markuson "pled the 5th."

h. Plaintiff reported the safety violation to the DOT/Truck Safety Manager, Ralph Treece ("Treece").

i. Treece stated that with the safety violations, the 750 cfm should never have been taken back to the customer.

j. Plaintiff provided the photographs he had of the 750 cfm to Treece.

27. In or around May 2020, during the Covid-19 pandemic, Plaintiff requested personal protective equipment ("PPE") (e.g., face masks, clorox wipes, and gloves) from Markuson. Despite asking for PPE on multiple occasions over the next three weeks, Plaintiff was not provided with PPE.

28. Also in or around May 2020, when Plaintiff observed Markuson giving a salesman PPE, Plaintiff asked Markuson where the drivers' face masks were and he replied, "you don't get any."

a. Plaintiff then texted regional manager Rob Jones ("Jones"), who had replaced Jason Glover, to inquire where the masks and other PPE were and informed Jones that Markuson had given masks to the salesman but not to drivers.

b. When Markuson found out Plaintiff asked Jones about the PPE, he cussed at and berated Plaintiff and made statements to the effect of:

i. "What the fuck, Dustin? You went to Rob for this?"

ii. "What the fuck is your problem, you want me fucking fired, don't you?"

    iii. "Here's your goddamned mask, mother fucker, now don't say I never gave them to you." This was said as Markuson aggressively shoved a handful of face masks into Plaintiff's chest; and

    iv. "I'm not worried about the other drivers because they don't bitch and cry and call corporate on me."

  c. During this interaction, Plaintiff reiterated to Markuson that he wanted the face masks for safety purposes.

29. In or around May 2020, Plaintiff sent a photograph of the empty PPE station to Jones. Jones replied and instructed Plaintiff to tell Markuson or Jeremy _____ [last name TBD], the new shop manager, to stock the PPE station.

  a. Jeremy became upset that Plaintiff discussed the PPE with Jones and got in Plaintiff's face and called Plaintiff a "liar" and insisted that Plaintiff never asked for PPE.

  b. Plaintiff responded Jeremy was, in fact, the liar because Plaintiff had asked for the PPE on multiple occasions.

  c. Jeremy then responded by putting his finger in Plaintiff's face and yelling, "don't you ever call me a liar!"

  d. Then Plaintiff stepped back and informed Jeremy that he was going to record the interaction, which diffused the situation.

30. In or around mid-May, 2020, Plaintiff was asked to work extra hours and when he returned and submitted his overtime to controller James Lordo ("Lordo"), he was told that he would not be paid overtime.

  a. When Plaintiff advocated for his overtime to be paid and told Lordo that it was illegal to take away his hours worked, Lordo told Plaintiff he had a "tampon stuck up your ass."

  b. Upon information and belief, Lordo then took the overtime issue to Markuson. Markuson attempted to move Plaintiff's overtime hours to the next week, and Plaintiff disputed. Plaintiff told Markuson that if he did not get his overtime hours paid, he would take it to a labor attorney.

31. On or around June 2, 2020, John _____ [last name TBD] from human resources arrived at Plaintiff's workplace and called Plaintiff into the office and asked him if he had any problems with anyone at work. Plaintiff replied that he was tired of being "cussed out" when he brought problems and safety violations to his managers' attention.

32. John replied that he had talked to 20 people, and they all said Plaintiff was a "problem."

33. On or around June 2, 2020, John and Markuson informed Plaintiff that he was suspended.

34. Plaintiff was informed that Defendant would contact him within 24 hours.

35. On or around June 5, 2020 (three days later), Plaintiff contacted Jones to inquire about the status of his suspension.

36. Later on the afternoon of June 5, 2020 after Plaintiff contacted Jones, John and another human resources representative called Plaintiff and informed him that he was terminated.

## **DEFENDANT ACTED WILLFULLY**

37. Defendant was aware that Plaintiff had reported multiple safety violations during his employment.

38. Defendant was aware that Plaintiff had reported many of these safety violations to supervisors, shop manager(s), regional manager(s), human resources, and Defendant's DOT/Truck Safety Manager.

39. Defendant's officers, directors, and managers exhibited animosity towards Plaintiff because he made workplace safety complaints.

40. Defendant knew or should have known its obligations under REDA, OSHA-NC, NCWHA, and the applicable state and federal DOT regulation.

41. Any reasonable employer knows about or can easily ascertain its obligations under REDA, OSHA-NC, NCWHA, and the applicable state and federal DOT regulations.

42. Despite at least the constructive knowledge of these legal obligations, Defendant acted willfully and maliciously when it retaliated against Plaintiff for his protected activity.

43. As a result of Defendant's willful and malicious conduct, Defendant is liable to Plaintiff for treble damages and/or punitive damages.

44. In the alternative to Plaintiff's allegations that Defendant violations were willful, he alleges that the violations were negligent.

## COUNT I

**Violation of the Retaliatory Employment Discrimination Act,
N.C. Gen. Stat. § 95-240 *et seq.***

45. Plaintiff reasserts the allegations set forth in the above paragraphs.

46. At all relevant times, Plaintiff was an "employee" of Defendant as that term is defined by REDA.

47. At all relevant times, Defendant was, and is a "person" as the term is defined by REDA.

48. During his employment with Defendant, Plaintiff (i) filed a claim or complaint, (ii) initiated an inquiry, investigation, inspection, or proceeding, and (iii) testified or provided information to a person regarding Defendant's workplace safety violations.

49. One or more of the workplace safety violations Plaintiff complained of, if true, would constitute a violation of the Occupational Safety and Health Act of North Carolina ("OSHA-NC").

50. During his employment with Defendant, Plaintiff (i) filed a claim or complaint, (ii) initiated an inquiry, investigation, inspection, or proceeding and (iii) testified or provided information to a person regarding wage payment violations.

51. One or more of the wage payment violations, specifically unpaid overtime, Plaintiff complained of, if true, would constitute a violation of the North Carolina Wage and Hour Act ("NCWHA").

52. During his employment, Plaintiff was repeatedly subject to retaliation for complaining of workplace safety violations in the form of yelling, swearing, and berating by his supervisors; being reprimanded for taking complaints to upper-level managers; and receiving a negative performance review.

53. During his employment, Plaintiff was subject to retaliation for complaining of wage payment violations.

54. Plaintiff was terminated in retaliation for engaging in protected activity concerning workplace safety violations and wage payment.

55. As an actual, proximate, and foreseeable consequence of Defendants' conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

56. Defendants' actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Plaintiff is entitled to recover treble damages in an amount to be determined at trial.

57. Defendants' officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## COUNT II

### Wrongful Discharge in Violation of Public Policy

58. Plaintiff reasserts the allegations set forth in the above paragraphs.

59. The public policy of North Carolina, as set forth in the REDA, N.C. Gen. Stat. § 95-240 *et seq.* states, "[n]o person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to [engage in protected activity]."

60. The public policy of North Carolina, as set forth in the Occupational Safety and OSHA-NC, § 95-126 *et seq.*, states:

    a. "[T]he burden of employers and employees of this State resulting from personal injuries and illnesses arising out of work situations is substantial; that the prevention of these injuries and illnesses is an important objective of the government of this State," and

    b. "The General Assembly of North Carolina declares it to be its purpose and policy through the exercise of its powers to ensure so far as possible every working man and woman in the State of North Carolina safe and healthful working conditions and to preserve our human resources."

61. The public policy of North Carolina, as set forth in Chapter 20 (Motor Vehicles) of the General Statutes, states:

a. "(1) The safety of their streets and highways is materially affected by the degree of compliance with state laws and local ordinances relating to the operation of motor vehicles. (2) The violation of a law or an ordinance relating to the operation of a motor vehicle is evidence that the violator engages in conduct that is likely to endanger the safety of persons and property. (3) The continuance in force of a license to drive is predicated upon compliance with laws and ordinances relating to the operation of motor vehicles in whichever jurisdiction the vehicle is operated." N.C. Gen. Stat. § 20-4.23.

62. The public policy of North Carolina, as set forth in the NCWHA, N.C. Gen. Stat. § 95-25.1 *et seq*. states, "[t]he wage levels of employees, hours of labor, payment of earned wages, and the well-being of minors are subjects of concern requiring legislation to promote the general welfare of the people of the State without jeopardizing the competitive position of North Carolina business and industry. The General Assembly declares that the general welfare of the State requires the enactment of this law under the police power of the State."

63. Defendants violated the public policy of North Carolina by terminating Plaintiff because he complained about workplace safety violations.

64. Defendants violated the public policy by terminating Plaintiff after he exercised her rights and engaged in protected activity.

65. As an actual, proximate, and foreseeable consequence of Defendants' conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

66. Defendants' actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

67. Defendants' officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands and prays for:

a) An Order pursuant to REDA finding Defendant liable for injunctive, equitable, compensatory, and treble damages;

b) A judgment awarding Plaintiff injunctive, equitable, compensatory, and punitive damages for Defendant's wrongful discharge in violation of public policy;

c) An Order awarding the costs of this action;

d) An Order awarding reasonable attorneys' fees;

e) An Order awarding pre-judgment and post-judgment interest at the highest rates allowed by law; and

f) An Order granting such other and further relief as may be necessary and appropriate.

# JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all issues of fact.

> */s/ L. Michelle Gessner*
> L. Michelle Gessner, N.C. Bar No. 26590
> Nicole K. Haynes, N.C. Bar No. 47793
> John G. Hutchens, III, N.C. Bar No. 52214
> GESSNERLAW, PLLC
> 602 East Morehead Street
> Charlotte, North Carolina 28202
> Tel: (704) 234-7442
> Fax: (980) 206-0286
> Email: michelle@mgessnerlaw.com
> nicole@mgessnerlaw.com
> johnny@mgessnerlaw.com
>
> *Attorneys for Plaintiff*