IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:21-CV-89-BO

| | |
|---|---|
| DUSTIN MATTHEWS, ) | |
|           Plaintiff, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| HERC RENTALS INC., ) | |
|           Defendant. ) | |

This cause comes before the Court on plaintiff's motion for sanctions under Fed. R. Civ. P. 37(e) and defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. Also pending is plaintiff's motion/objection to evidence filed in support of defendant's motion for summary judgment and defendant's motion for leave to manually file exhibit. The appropriate responses and replies have been filed, or the time for doing so has expired, and the motions are each ripe for ruling. For the reasons that follow, plaintiff's motions are denied and defendant's motions are granted.

## BACKGROUND

Plaintiff began his employment with defendant ("Herc") in February 2016 when he was hired as a tractor-trailer driver. Plaintiff worked for Herc at its Wilmington, North Carolina branch. While plaintiff was employed by Herc, he was supervised by the Wilmington branch manager, Richard Markuson. The regional manager when plaintiff began working for Herc was Jason Glover, and at the time plaintiff's employment was terminated it was Rob Jones. Jeremy Palmatier was a shop supervisor at the Wilmington branch.

While working for Herc, plaintiff made deliveries to Herc customers and worked with a coordinator to schedule deliveries as well as load and unload equipment. As a part of their duties,

plaintiff and other drivers were required to conduct pre-and post-trip inspections of their tractors and complete a Daily Vehicle Inspection Report ("DVIR)" for both their tractor and trailer. DVIRs were to be completed daily and submitted to the branch, and were to include inspections of tires, safety equipment, and various systems. Drivers, including plaintiff, would also keep a notepad in their vehicles to make note of any additional issues.

In his complaint, plaintiff alleges that he made multiple workplace safety complaints to Herc. In May 2016, plaintiff alleges he reported a problem regarding an illegal tire tread to Markuson, who told plaintiff to operate the vehicle despite the tire problem. Plaintiff called Herc's human resources 1-800 number and was told by a safety official not to operate the vehicle. Compl. ¶ 18. In June 2017, plaintiff alleges he made a report to Markuson regarding a co-worker smoking in a Herc vehicle, which was against policy. Plaintiff then reported the issue to Glover, who addressed the issue. Plaintiff alleges that Markuson berated plaintiff thereafter for "going over his head." *Id.* ¶ 19. In May 2018, plaintiff discovered a piece of broken equipment that was set to be transferred from one customer to another. After being told by a Herc salesman to not tell the customer and leave it at the job site, plaintiff again reached out to Glover, and Markuson again allegedly berated plaintiff for "trying to get [him] fired." *Id.* ¶ 20. Plaintiff makes other, similar allegations regarding needed repairs, plaintiff reporting the issue on his DVIR or contacting Glover, and Markuson berating plaintiff for "going over his head." *Id.* ¶¶ 21-23.

In plaintiff's 2018 annual review, Markuson found that plaintiff was a good driver but that he had issues with his attitude and problems with co-workers. Plaintiff alleges that his poor performance review resulted in his receiving a lower annual raise than other employees. In October 2019, plaintiff was seen by Palmatier driving a forklift without wearing a seatbelt, in violation of Herc policy. According to Herc's Employee Handbook, operating equipment without a safety belt

2

is a serious offense. [DE 52-10 p. 34 of 84]. Plaintiff contends that the seatbelt was broken. Also in October 2019, Palmatier discovered plaintiff had clocked in for work before he actually arrived at the Herc facility. Plaintiff contends that he did not falsify his timecard and that he had been instructed to perform work on his way to the facility. In March 2020, plaintiff reported a safety violation to the Department of Transportation (DOT)/Truck Safety Manager, Ralph Treece, after Markuson permitted Palmatier to drive a truck for which he did not, on information and belief, have the proper medical examiner's certificate (medical card). Compl. ¶ 28.

In May 2020, plaintiff complained to Markuson and Jones, who had replaced Glover, about not receiving personal protective equipment (PPE) which was being provided due to the COVID-19 pandemic. *Id.* ¶ 27. Plaintiff alleges that in mid-May 2020, he was asked to work extra hours and when he submitted his overtime to James Lordo, a senior sales and operations coordinator, he was told he would not be paid overtime.

In June 2020, plaintiff's co-worker Joe Marino reported to Palmatier, Markuson, and Lordo that plaintiff had told him (Marino) that he "looked like George Floyd." The next day, Palmatier emailed Markuson to express his concerns for his own safety and the safety of other employees based upon plaintiff's conduct. Herc initiated an investigation of plaintiff's behavior through its Senior Director of Corporate Security. Plaintiff was suspended pending the investigation, and his employment was terminated on June 26, 2020.

Plaintiff initiated this action on May 14, 2021. He alleges two claims for relief: violation of North Carolina's Retaliatory Employment Discrimination Act (REDA), N.C. Gen. Stat. § 95-240, *et seq.*, and wrongful discharge in violation of North Carolina public policy. Plaintiff alleges that Herc retaliated against him due to his complaints of workplace safety violations pursuant to the Occupational Safety and Health Act of North Carolina and overtime wage violations pursuant

3

to the North Carolina Wage and Hour Act. Plaintiff alleges that Herc also violated public policy when it terminated him following his complaints about workplace safety and wage and hour violations.

## DISCUSSION

### I. Motion for sanctions

The Court addresses first plaintiff's motion for sanctions pursuant to Rule 37(e) for spoliation of evidence. Spoliation of evidence is "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citation omitted). A party seeking sanctions based on spoliation must establish four threshold requirements: (1) the information should have been preserved, (2) the information was lost, (3) the information was lost because a party failed to take reasonable steps to preserve it, and (4) the information cannot be restored or recovered through additional discovery. *Eshelman v. Puma Biotechnology, Inc.*, 2017 U.S. Dist. LEXIS 87282, at *13 (E.D.N.C. June 7, 2017) (citation omitted); *Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 844–45 (S.D.W. Va. 2018) (citation omitted); Fed. R. Civ. P. 37(e). If those elements are met, the district court has broad discretion in choosing an appropriate sanction "both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Silvestri*, 271 F.3d at 590 (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)).

Plaintiff seeks information on his own Herc-issued cell phone as well as information on the Herc-issued cell phones of other employees with whom plaintiff was communicating while he was employed by Herc. Defendant has submitted that, pursuant to its policy, when plaintiff was suspended in June 2020 his Herc-issued cell phone was taken by Markuson. Following the

4

termination of plaintiff's employment on June 26, 2020, plaintiff's Herc-issued cell phone was returned to the company in July 2020 where it was wiped of stored information shortly thereafter. The cell phone was re-issued to another employee in December 2020.

"Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence." *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). Additionally, "courts in the Fourth Circuit have found that the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 106 (E.D. Va. 2018).

The complaint here was filed in May 2021, long after plaintiff's phone was wiped clean pursuant to company policy. Herc argues that the duty to preserve evidence was triggered no earlier than March 10, 2021, when Herc received notice of plaintiff's complaint to the North Carolina Department of Labor, which had been filed on September 25, 2020. Plaintiff contends that Herc knew that litigation was foreseeable when it terminated his employment because he made statements to co-workers that they should "talk to [his] lawyer" or that he was "lawyering up." These general comments, made at unspecified times and not to someone identified as being in plaintiff's chain of command, are insufficient to trigger the duty to preserve evidence. *See Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 4101828, at *9 (M.D.N.C. Aug. 22, 2018). Plaintiff also relies on a text message sent to Markuson wherein he stated he was being "discriminated against" regarding Herc's provision of equipment. Again, a vague reference to feeling discriminated against is not sufficient to trigger the duty to preserve evidence. *Id*.

A party must show more than the existence of a dispute to trigger the duty to preserve. *Steves & Sons*, 327 F.R.D. at 106. Plaintiff's non-specific statements about having an attorney or feeling he was being treated unfairly do not objectively amount to any direct, specific threat of

5

litigation. *Johns v. Gwinn*, 503 F. Supp. 3d 452, 465 (W.D. Va. 2020). Accordingly, the duty to preserve was not triggered prior to Herc's sending plaintiff's cell phone to be wiped pursuant to company policy.

Markuson also deleted text messages from his phone, but as Herc has argued, this also occurred prior to the triggering of any duty to preserve evidence. Moreover, plaintiff has produced text messages with Markuson as well as photographs and videos from his phone. Plaintiff has failed to demonstrate that the evidence he contends was spoliated "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). His motion for sanctions due to spoliation of evidence is therefore denied.

II.     Motion for summary judgment

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. . . . and [a] fact is material if it might affect

the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

At the outset, the Court addresses plaintiff's objection, filed as a motion, to defendant's evidence proffered in support of its motion for summary judgment. Plaintiff challenges the evidence filed in support of Herc's summary judgment motion as lacking authentication. As defendant argues, plaintiff's arguments appear to be based on a prior version of Fed. R. Civ. P. 56 and cases interpreting the requirements of a summary judgment motion under the old rule. Following an amendment in 2010, Rule 56 now requires only that a motion for summary judgment be supported by evidence that could be provided in admissible form at trial. *See Singletary on behalf of N.M.M. v. Cumberland Cnty. Sch.*, No. 5:12-CV-744-FL, 2016 WL 8711336, at *5 (E.D.N.C. Feb. 12, 2016), *report and recommendation adopted sub nom. Singletary v. Cumberland Cnty. Sch.*, No. 5:12-CV-744-FL, 2016 WL 953256 (E.D.N.C. Mar. 14, 2016). As in *Singletary*, plaintiff does not argue that the evidence relied upon by defendant *cannot* be authenticated, only that it has not been authenticated in the filing of the motion. Plaintiff's objection is overruled and the motion is denied.

The Court further grants defendant's unopposed motion for leave to manually file Exhibit 12.

### A. NC REDA

North Carolina's REDA prohibits retaliation by employers against employees who engage in protected activity. N.C. Gen. Stat. § 95-241(a). Protected activity includes the good faith filing of a claim or complaint; initiating an inquiry, investigation, inspection, proceeding or other action;

or testifying or providing information to any person with respect to several enumerated state laws concerning employment practices, or threatening to do any of the foregoing. *Id.* § 95-241(a)(1). The enumerated state laws include statutes addressing workplace safety and wage and hour laws. "'Retaliatory action' means the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment." N.C. Gen. Stat. § 95-240(2). Finally, REDA provides that it is not a violation to discharge or take unfavorable action toward an employee where the employer can show it would have taken the unfavorable action notwithstanding the employee having engaged in protected activity. *Id.* § 95-241(b).

Thus, to state a *prima facie* REDA claim, a plaintiff must show that he (1) exercised his right to engage in protected activity and (2) suffered an adverse employment action that was causally connected to the exercise of that protected activity. *Edwards v. PCS Phosphate Co.*, 812 F. Supp. 2d 689, 693 (E.D.N.C. 2011). If plaintiff establishes a *prima facie* REDA claim, the burden shifts to defendant to show that it would have taken the same adverse action in the absence of the employee's protected activity. *Id.* If defendant does show a legitimate reason for the adverse action, the burden shifts back to plaintiff to demonstrate that the proffered legitimate reason was actually pretext for discrimination. *Lilly v. Mastec N. Am., Inc.*, 302 F. Supp. 2d 471, 481 (M.D.N.C. 2004).

(1) Protected activity.

Plaintiff identifies the following conduct as protected activity under REDA: his complaints related to unsafe trucks and equipment, his complaint that Palmatier operated a Herc vehicle without a medical card, his complaints concerning the availability of PPE during COVID, and his complaint concerning unpaid overtime hours. [DE 54 at 10-12].

8

It is undisputed that plaintiff did not complain to or initiate any investigation with an outside entity such as the state Department of Labor, and the parties agree that the North Carolina Supreme Court has not determined whether internal complaints are protected under REDA. However, lower North Carolina and federal courts have held that "[s]ome internal complaints are protected under REDA." *Davis v. Capital Ready Mix Concrete, LLC*, No. 5:21-CV-463-D, 2023 U.S. Dist. LEXIS 200075, at *21 (E.D.N.C. Nov. 7, 2023).

To determine whether an internal complaint is protected activity under REDA, courts should consider "whether it relates or leads to an investigation; whether it's made to someone other than the plaintiff's 'supervisors or managers,'; and whether workplace safety [or other covered subject] is a primary focus of the complaint[.]" *Driskell v. Summit Contracting Grp., Inc.*, 828 F. App'x 858, 867 (4th Cir. 2020) (internal citations omitted). Simply voicing concerns about employment matters covered by REDA, such as safety conditions or unlawful favoritism, does not constitute a protected activity under REDA. *Sanders v. Waffle House, Inc.*, No. 5:21-CV-485-FL, 2023 WL 2587479, at *6 (E.D.N.C. Mar. 21, 2023) ("making oral complaints to a supervisor, even regarding a subject covered by REDA, is not a protected activity."). Internal complaints which have been found to constitute protected activity include complaints to an auditor about an ongoing investigation and complaints made to a company's president. *See Driskell*, 828 F. App'x at 867; *Pierce v. Atl. Grp., Inc.*, 219 N.C. App. 19, 28 (2012).

Plaintiff's safety complaints made to Markuson, Glover, Jones, and Palmatier regarding the condition of his vehicle and equipment and other safety violations do not rise to the level of protected activity. Though workplace safety was the primary focus, plaintiff's complaints were made only to his supervisor, managers, and shop manager and plaintiff has come forward with no

9

evidence which would indicate that these complaints initiated or resulted in any investigation. *See, e.g.,* [DE 52] Ex. 12 (11 June 2020 video of plaintiff making safety complaints to Markuson).

Plaintiff also contends he complained to Herc's Senior DOT Safety Manager, Treece, about Palmatier driving a Herc vehicle without the proper medical card. Plaintiff's text messages to Treece do reflect that on June 11, 2020, plaintiff sent a number of photographs of equipment to Treece and the text "No dot card for manager who towed it". [DE 46-6] Ex. 6. Even viewing the facts in the light most favorable to plaintiff, and assuming that Treece was sufficiently outside or above the level of plaintiff's supervisors and managers, the Court cannot conclude that such a bare statement constitutes protected activity.

Plaintiff's complaints regarding PPE during the COVID pandemic were also made to his supervisor, manager, and co-worker. In sum, plaintiff has not come forward with evidence that he complained to the president or CEO of Herc or to an internal auditor, or that he initiated or threatened to initiate a complaint with the Occupational Safety and Health Review Commission, or that his safety complaints were related to an ongoing investigation or led to an investigation. *See Davis*, 2023 U.S. Dist. LEXIS 200075, at *23 (discussing cases).

The record further lacks evidence regarding plaintiff's alleged overtime complaints. Though plaintiff has alleged that this complaint occurred in mid-May 2020, he has failed to come forward with any evidence which would support such an allegation in response to the motion for summary judgment. Though he states in his declaration filed in opposition to summary judgment that he "complained about not receiving overtime pay" to both Markuson and Lordo, plaintiff fails to identify when such a complaint was made and whether it resulted in any investigation. A general statement complaining about overtime pay is simply insufficient at this stage to create a genuine issue of fact as to whether plaintiff engaged in protected activity concerning overtime wages.

Accordingly, the plaintiff has failed to create a genuine issue of fact as to whether he engaged in protected activity.

(2) Adverse employment action.

Assuming, *arguendo*, that plaintiff could satisfy the first element of his REDA claim, the adverse employment actions he suffered were limited. Plaintiff plainly suffered adverse employment action when he was suspended in 2018 and when he was suspended and then terminated in June 2020. Though plaintiff attempts to rely on other actions taken by Herc, he has failed to create a genuine issue of fact as to whether such actions were sufficiently adverse to constitute adverse employment action in the context of a retaliation claim. Plaintiff identifies the following additional adverse employment actions that he suffered due to his engagement in allegedly protected activity: being yelled at and berated by his supervisors, being reprimanded for taking complaints to upper-level managers, receiving a negative performance review, and being sent home.

Courts look to Title VII for guidance in determining whether an employment action was adverse in REDA cases. *Sood v. Tempur Sealy Int'l, Inc.*, No. 1:19-cv-01248, 2020 U.S. Dist. LEXIS 172285, at *17 (M.D.N.C. Sep. 21, 2020). Adverse actions in the retaliation context are those that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of" retaliation. *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006). Plaintiff's allegation that he was yelled at, cussed at, and berated for making safety complaints does not rise to the level of adverse employment action for purposes of his retaliation claim. *See Wilcoxon v. DECO Recovery Mgmt., LLC*, 925 F. Supp. 2d 725, 731 (D. Md. 2013); *Staggers v. Becerra*, No. CV ELH-21-0231, 2021 WL 5989212, at *23 (D. Md. Dec. 17, 2021) (berating not adverse action for retaliation claim where there has been no allegation of any

11

meaningful injury or harm). Reprimands and poor performance reviews are alone not adverse employment actions. *Smith v. Virginia Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 510 (E.D. Va. 2020). Though plaintiff alleges he received a lower annual raise due to his performance review, he has come forward with no evidence which would support his claim, and Herc has proffered evidence that plaintiff received the same raise as other employees following his 2018 performance review. [DE 58-3]. Plaintiff has not come forward with evidence which would create a genuine issue of fact as to whether being sent home during one shift was sufficiently harmful such that it would dissuade a reasonable worker from engaging in protected activity. Accordingly, even assuming that plaintiff engaged in protected activity, the only adverse employment actions he suffered were his 2018 suspension and 2020 suspension and termination.

(3) Causation.

To establish a causal connection between protected activity and adverse employment action, a close temporal proximity is required. *Wilkerson v. Pilkington N. Am., Inc.*, 211 F. Supp. 2d 700, 707 (M.D.N.C. 2002). "While an exact time period required for a temporal connection has not been established by courts evaluating REDA claims, it has been held that ninety days between the [protected activity] and the employer's adverse action is too long to create an inference of retaliation." *Id.* One month or less may be sufficient to establish causation, but two and a half months may be sufficient to sever it. *Smith v. Computer Task Grp., Inc.*, 568 F. Supp. 2d 603, 614 (M.D.N.C. 2008). (collecting cases).

Accordingly, only plaintiff's complaints which occurred close in time to his suspensions and termination could support a REDA claim. Thus, many of the safety complaints identified in plaintiff's complaint, even were they to be considered protected activity, could not support a REDA claim. In his declaration, plaintiff states that he complained to Markuson and Lordo about

12

overtime within one month of his termination. Plaintiff also complained to Treece about Palmatier's lack of medical card in the weeks prior to his termination. Accordingly, viewing the facts in the light most favorable to plaintiff, only these actions could support his REDA claim. However, as discussed below, plaintiff's REDA claim ultimately fails.

(4) Pretext.

Even assuming, without deciding, that plaintiff has established a *prima facie* claim for retaliation in violation of North Carolina's REDA based on one or more of his internal complaints, plaintiff has failed to rebut Herc's proffered legitimate basis for terminating his employment. In February 2018, plaintiff was suspended after he was involved in a verbal altercation with another employee. *See* [DE 52-2] Matthews Depo. at 168; [DE 52-7] (Final Written Warning). Plaintiff's 2018 annual review reflected that he had "great ability" and was a "great driver," but that his attitude was at times poor. [DE 52-8]. It was noted that he had difficulty supporting Herc's "vision and values" and Markuson recommended that plaintiff improve his attitude and communication with colleagues. *Id.*

In October 2019, plaintiff was seen by Palmatier operating a forklift without a seatbelt, in violation of Herc policy. [DE 52-9]. Palmatier documented plaintiff clocking in before his actual arrival on October 25, 2019. [DE 52-11]. On June 18, 2020, Palmatier sent an email to Markuson outlining his concerns regarding plaintiff. [DE 52-15]. Palmatier cited plaintiff's "attitude and mischief" as well as a racially motivated comment made to another employee regarding George Floyd, who had been killed just weeks earlier. Palmatier described plaintiff's disrespectful behavior and his concerns that the behaviors plaintiff was exhibiting would only get worse. *Id.* Finally, Palmatier highlighted his concerns for the safety of other employees and himself due to

13

plaintiff's behavior. *Id.* This email was ultimately provided to Herc's human resources department and the district manager Jones. *Id.*

Herc then initiated an investigation by its Senior Director of Corporate Security, John Berberian. Berberian conducted interviews with plaintiff's co-workers, who signed Berberian's notes of their conversations. [DE 52-17]. The notes detail a range of behaviors by plaintiff, from throwing a co-worker's boots on the roof to spitting in the coffee pot and urinating on a co-worker's truck. Plaintiff is described variously as "causing problems" and starting trouble. According to Berberian's notes, in plaintiff's interview with Berberian he admitted putting a co-worker's chains in knots and to telling a co-worker that he looked like George Floyd.

"To raise a factual issue regarding pretext, the plaintiff's evidence must go beyond that which was necessary to make a *prima facie* showing by pointing to specific, non-speculative facts which discredit the defendant's non-retaliatory motive." *Wells v. N. Carolina Dep't of Correction*, 152 N.C. App. 307, 317 (2002); *see also Webb v. K.R. Drenth Trucking, Inc.*, 780 F. Supp. 2d 409, 414 (W.D.N.C. 2011). Plaintiff has failed to do so here. The only evidence proffered by plaintiff to specifically rebut Herc's evidence is his own declaration wherein he disputes that the conduct described by his co-workers took place and reiterates his belief that he was retaliated against for engaging in protected activity. "Plaintiff's good faith belief of retaliatory intent, without more, is not enough to withstand summary judgment." *Wiley v. United Parcel Serv., Inc.*, 102 F. Supp. 2d 643, 652 (M.D.N.C. 1999).

Plaintiff has also submitted the declaration of a co-worker, Larry Wilson, which states that Wilson did not like the way plaintiff was fired, did not like Berberian's investigation, and did not like Palmatier's management style. [DE 56-7]. However, this is insufficient to create a genuine issue of fact as to pretext. The same is true of the declaration of Michael Suggs that plaintiff has

14

proffered. [DE 56-8]. Suggs states that though he did not hear what plaintiff said to Marino on the morning of the alleged George Floyd comment, Markuson persisted that Suggs heard the comment and demanded that Suggs produce a written and signed statement regarding the incident. Suggs then contacted Jones, who told Suggs to go to work as usual and that if Markuson or Palmatier tried to intimate him Jones would take care of it. Suggs further states that though Lordo had told him that John, presumably Berberian, was supposed to talk to everyone, when Suggs approached John he was told that John did not need to talk to him, and John rudely dismissed him. Even drawing all inferences in plaintiff's favor, Suggs's declaration supports that Markuson and Berberian were only interested in hearing from employees who had disagreements with plaintiff, but this does not go far enough to discredit Herc's proffered non-retaliatory motive and does not create a genuine issue of fact as to whether plaintiff's alleged protected activities, i.e. his safety and wage and hour complaints, were the true cause of his termination, rather than any other concern. Indeed, "when an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not [a court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 279 (4th Cir. 2000) (internal quotation marks omitted). Whether plaintiff agrees with the statements his co-workers made to Berberian or whether plaintiff believes Palmatier's safety concerns to lack merit is of no moment at this stage. Herc has proffered legitimate grounds for plaintiff's suspension and termination, and plaintiff has simply failed to meet his burden to create a genuine issue of fact as to pretext. Accordingly, plaintiff's REDA claim fails.

B. Wrongful discharge in violation of public policy

Plaintiff's wrongful discharge claim is grounded upon the same public policies which support his REDA claim. *Computer Task Grp.*, 568 F. Supp. 2d at 621. Because summary judgment in favor of Herc is appropriate on plaintiff's REDA claim, plaintiff's wrongful discharge claim fails as a matter of law. *Id.*

## CONCLUSION

Accordingly, plaintiff's motion for sanctions under Rule 37(e) due to spoliation of evidence [DE 43] is DENIED, defendant's motion for summary judgment [DE 50] is GRANTED, defendant's motion for leave to manually file Exhibit 12 [DE 53] is GRANTED, and plaintiff's objection to evidence [DE 57] is overruled and the motion is denied. The clerk is DIRECTED to enter judgment in favor of defendant and close the case.

SO ORDERED, this $\cancel{22}$ day of November 2023.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE